# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL COMPLAINT** |
| v. | : | |
| | : | |
| ALMALIK ANDERSON, | : | The Honorable Steven C. Mannion |
|    a/k/a "S," a/k/a "Sco," | : | |
| QUAWEE JONES, | : | |
|    a/k/a "Hatman," | : | |
| KASIM BACON, | : | |
|    a/k/a "City," | : | |
| MAURICE GREEN, | : | |
|    a/k/a "Crack," | : | Mag. No. 15-6234 |
| DAVIN LEE, | : | |
|    a/k/a "Kiss," | : | |
| CHRISTOPHER WILLIAMS | : | |
|    a/k/a "Whooty," | : | |
| ELIJAH HENDERSON | : | |
|    a/k/a "Fresh," | : | **FILED UNDER SEAL** |
| SHAKIR AMOS, | : | |
|    a/k/a "Ya Ya," | : | |
| OMAR JOHNSON, | : | |
|    a/k/a "Flip," | : | |
| SHAAHID CURETON, | : | |
|    a/k/a "Dilly," | : | |
| DARRYLE ROBINSON, | : | |
|    a/k/a "Silk," | : | |
| MELVIN ELLISON, | : | |
|    a/k/a "Mellie," and | : | |
| DARREN BROWN, | : | |
|    a/k/a "D-Block," | : | |
| TEMIR HILL, | : | |
|    a/k/a "Goldie," | : | |
| SALIK AMOS, | : | |
|    a/k/a "Slim" | : | |

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation and that this criminal complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached page and made a part hereof.

_____
Jeffrey Kidder
Special Agent
Federal Bureau of Investigation


Sworn to before me and subscribed in my presence,
November 18, 2015 at Newark, New Jersey

THE HONORABLE STEVEN MANNION

_____
UNITED STATES MAGISTRATE JUDGE                    Signature of Judicial Officer

## ATTACHMENT A

### Count One
### (Continuing Criminal Enterprise)

From in or about January 2015 through in or about November 2015, in Essex County, in the District of New Jersey and elsewhere, defendants

ALMALIK ANDERSON, a/k/a "S," a/k/a "Sco,"
QUAWEE JONES, a/k/a "Hatman,"

did knowingly and intentionally engage in a continuing criminal enterprise in that each defendant knowingly and intentionally violated Title 21, United States Code, Section 841(b)(1)(A), which violation includes, but is not limited to, the acts comprising the conspiracy alleged in Count Two, which acts were part of a continuing series of acts that constitute violations of that statute undertaken by each defendant in concert with five or more persons, with respect to whom each defendant occupied the position of organizer, supervisor, manager, and from which continuing series of violations each defendant obtained substantial income and resources.

In violation of Title 21, United States Code, Sections 848(a) and 848(c).

**Count Two**
**(Conspiracy to Distribute Heroin)**

From in or about January 2015 through in or about November 2015, in Essex County, in the District of New Jersey and elsewhere, defendants

ALMALIK ANDERSON, a/k/a "S," a/k/a "Sco,"
QUAWEE JONES. a/k/a "Hatman"
KASIM BACON, a/k/a "City"
MAURICE GREEN,  a/k/a "Crack"
DAVIN LEE,  a/k/a "Kiss,"
CHRISTOPHER WILLIAMS, a/k/a "Whooty,"
ELIJAH HENDERSON, a/k/a "Fresh,"
SHAKIR AMOS, a/k/a "Ya Ya,"
OMAR JOHNSON, a/k/a "Flip,"
SHAAHID CURETON, a/k/a "Dilly,"
DARRYLE ROBINSON, a/k/a "Silk,"
MELVIN ELLISON,  a/k/a "Mellie,"
DARREN BROWN, a/k/a "D-Block,"
TEMIR HILL, a/k/a "Goldie,"
SALIK AMOS, a/k/a "Slim,"

did knowingly and intentionally conspire with each other and others to distribute and possess with intent to distribute one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A).

In violation of Title 21, United States Code, Section 846.

## ATTACHMENT B

I, Jeffrey Kidder, have been a Special Agent with the Federal Bureau of Investigation
("FBI") since 2010. I have been personally involved in the investigation of this matter. The
information contained in this Criminal Complaint is based on my personal knowledge and on
information obtained from other sources, including: (a) statements made or reported by various
witnesses with knowledge of relevant facts; (b) my review of publicly-available information
relating to the defendants; (c) my review of business records, other documents, and evidence
obtained through court orders, subpoenas, and other sources; and (d) my review of audio and
video recordings and photographs. Because this Criminal Complaint is being submitted for the
limited purpose of establishing probable cause, it does not include every fact that I have learned
during the course of the investigation. All dates and times are approximate.

## THE 25 JOHNSON AVENUE, NEWARK, NEW JERSEY

1.     The location relevant to this Criminal Complaint is 25 Johnson Avenue in
Newark, New Jersey (hereinafter "25 Johnson" or "the Building"). The Building begins at
Clinton Avenue and runs for one block. The block ends at Shabazz Field, an athletic field
connected to Shabazz High School. There is no outlet for vehicular traffic that enters Johnson
Avenue from Clinton Avenue, as the athletic field is a "dead end." 25 Johnson Avenue is an
approximately four-story building located near the middle of the block.

## THE HEROIN DISTRIBUTION OPERATION INSIDE 25 JOHNSON

2.     During the time relevant to the conspiracy as charged in Count Two of this
Criminal Complaint, law enforcement has, at various times, surveilled the area in and around 25
Johnson, viewed footage from a camera that had been installed inside the first floor hallway of
25 Johnson, conducted numerous controlled purchases of heroin that have been audio and video
recorded, and made arrests for drug distribution inside 25 Johnson. From these various
investigatory methods, as well as information from confidential sources as detailed in part below,
law enforcement officers have determined that a group of approximately 15 or more individuals
sold large amounts of heroin from the first floor hallway and sometimes other areas of the
Building (hereinafter, the "Heroin Distributors"). The Heroin Distributors worked in "shifts" and
law enforcement officers have conducted recorded controlled purchases of heroin from at least
14 of those individuals at various times of the day.

3.     During the period relevant to Count Two of this Criminal Complaint, the Building
operated nearly 24 hours a day and was well-known in Newark as a large-scale heroin
distribution center. Numerous "buyers" who appear to be heroin addicts were observed going
into and out of the Building consistently throughout the day and evening. The heroin sold was
high in quality  and thus attracted numerous buyers. The Heroin Distributors sold various
"brands" of heroin which were stamped onto the glassine envelopes that contained the heroin,
thus allowing buyers to identify and purchase the brands that they preferred. Because of the
Building's location as described above, police could not infiltrate the building without lookouts

signaling their presence. The Heroin Distributors set up a sophisticated escape route whereby residents were paid to keep their doors unlocked so that the heroin dealers in the hallways could run inside and escape down the fire escapes in the rear of the Building or, alternatively, just hide within the apartments before police could apprehend them. In addition to being paid to keep their doors unlocked, residents were also paid to not report to law enforcement the drug-trafficking activity that was open and notorious within the building's public areas.

## ALMALIK ANDERSON'S CONTROL OVER THE HEROIN OPERATION

4.     Defendant ALMALIK ANDERSON ("Anderson") has been the leader of the heroin distribution network that controls 25 Johnson since at least 2011. Surveillance by law enforcement has revealed that Anderson was regularly seen at various times of the day standing in front of either 22 Johnson Avenue, directly across the street from 25 Johnson, or 23 Johnson, the Building next door to 25 Johnson. According to a Confidential Source ("CS-1"),[1] Anderson was the sole supplier of heroin to the individuals who sold the heroin in the first-floor hallway of the building. Each day, Johnson or one of his trusted managers, including defendant QUAWEE JONES, a/k/a "Hatman" (hereinafter "Jones"), delivered kilogram quantities of heroin packaged in bricks[2] for distribution inside 25 Johnson. There, the Heroin Distributors divided up the bricks of heroin for sale on a particular shift. Anderson charged the Heroin Distributors approximately $160 to $180 per brick. The distributors charged heroin buyers approximately $210 to $240 per brick. Any proceeds above what Anderson charged was profit for the distributor after the distributor paid $25 per day to a resident of the building to keep the resident's door unlocked in case police raided the building. An additional $10 per day was paid to a lookout who would watch the block for police presence and signal if police were approaching. Based on the investigation, it is estimated that Anderson and the Heroin Distributors sold approximately 2,000 to 3,000 bricks or more of heroin per week. Anderson or one of his managers, including Jones, collected the money for the bricks of heroin on a daily basis.

5.     CS-1's information regarding Anderson is corroborated by a second Confidential Source ("CS-2"). CS-2 has known Anderson for several years and has purchased heroin inside Johnson Avenue on numerous occasions, both prior to CS-2's cooperation with the FBI and during video recorded controlled buys of heroin between in or about February and in or about November of 2015. CS-2 also stated that Anderson controlled the heroin distribution inside 25 Johnson. CS-2 stated that Jones was Anderson's partner in the organization and that defendant

---

[1] CS-1's information is corroborated by intercepted calls made pursuant to court-authorized wiretap orders, law enforcement surveillance, prior arrests made inside 25 Johnson Avenue, video footage of the heroin distribution taken from a hidden camera inside the first floor hallway of 25 Johnson Avenue, social media postings, public records and other Confidential Sources.

[2] A "brick" is a street term that refers to a package of heroin containing five "bundles" of heroin, which, in turn, is a package containing 10 individual "hits," or doses, of heroin. These individual doses are packaged in glassine envelopes that are referred to as "decks" or "bags" of heroin. Thus, a "brick" contains 50 "decks," or doses, of heroin.

KASIM BACON, a/k/a "City," was another high-level manager for Anderson and Jones.[3] This information is corroborated further by video and audio recordings of Anderson standing in and around 25 Johnson taken between in or about February and in or about July 2015. During these audio-video recordings, Anderson is: (1) discussing which brands of heroin are available inside 25 Johnson Avenue, including the brands "Amazing" and "Total"[4]; (2) setting the price of a brick of heroin with defendant MELVIN ELLISON, a/k/a "Mellie"; (3) telling a buyer to go into the building to obtain heroin; (4) telling a buyer: "Yo, you gotta walk in the building, don't stop and talk, police be watching."

## JONES' ROLE IN THE HEROIN OPERATION

7.      According to CS-2, Jones is a partner in the heroin distribution organization at 25 Johnson.[5] On or about August 25, 2015, a third confidential source, CS-3, wearing a hidden camera, recorded Jones standing outside of 25 Johnson while heroin buyers were being serviced by distributors a short distance away at the front door of 25 Johnson. At that time, Anderson was in Atlanta, Georgia for a period of several weeks and Jones was running the day-to-day heroin distribution at 25 Johnson in Anderson's absence. During this recorded conversation, Jones told CS-3, in sum and substance, that because CS-3 had been working for Jones and Anderson in the heroin distribution business, that CS-3 should let Jones know if CS-3 ever needed anything. Jones then bragged to CS-3 that he was involved in a fight with another individual, and because the other individual was a smoker, Jones was able to outlast the other individual and win the fight. Jones then bragged that he had robbed the other individual of his property after the fight.

---

[3] CS-2's information is corroborated by calls intercepted pursuant to court-authorized wiretap orders, law enforcement surveillance, prior arrests made inside 25 Johnson, video footage of the heroin distribution taken from a hidden camera inside the first floor hallway of 25 Johnson, social media postings, public records and other confidential sources.

[4] As described below, among the brands of heroin purchased during the controlled purchases were "Amazing" and "Total Recall."

[5] CS-2's information is further corroborated by records obtained during the investigation that show Anderson and Jones are partners in at least two business ventures, a business purchasing vehicles at auto auctions and a clothing store business with two storefronts in Newark named "Rich Hearted Clothing." Bank records show that someone on behalf of Rich Hearted Clothing possibly structured money into an account controlled by Anderson and Jones by making two separate deposits at the same bank branch on the same date which totaled $10,001. The first transaction, made on March 13, 2015, was for $2801.00 and the second was for $7,200.00. Anderson and Jones also used large amounts of cash to purchase approximately 14 used vehicles over about two years. For example, Jones paid $11,990 in cash for three vehicles on November 10, 2014 and $14,680 in cash for two vehicles on September 25, 2014. Anderson paid $19,840 in cash for four vehicles on January 14, 2015.

## SEIZURES OF HEROIN AND GUNS INSIDE 25 JOHNSON AVENUE

### A.  The January 1, 2015 Seizure

8.   On or about January 1, 2015, members of the Newark Police Department observed an individual engaged in a heroin transaction with a buyer at the front entrance of 25 Johnson. The police exited their vehicle and the individual ran inside the building. Police pursued the suspect, who dropped 40 glassines of heroin which police recovered from the floor near the front entrance. The suspect ran into apartment 4B on the fourth floor and slammed the door shut on the police, who quickly broke down the door and entered the apartment. The suspect had fled out the window (the window was ajar and the screen protector was ripped out of place and was on the living room floor) and down a fire escape. Detectives recovered several additional glassines of heroin from the fire escape along with a small amount of U.S. Currency.

9.   Once back in the apartment, detectives noticed an older man and woman inside. The woman was attempting to place a loaded black .9mm handgun under a mattress. She was stopped by police and the gun was recovered. Additional glassine envelopes of heroin were recovered, as well as a brick of heroin. In total, 388 glassine envelopes (or approximately nearly eight bricks) of heroin were recovered, including those marked with the brand names "Morning Rush," "Total Control," and "The Virus," all brands that were purchased by the FBI during subsequent controlled buys of heroin from the defendants as detailed below.

10.   The individual who escaped down the fire escape was later identified as defendant MELVIN ELLISON, a/k/a "Mellie."

### B.  The April 15, 2015 Seizure

11.   On or about April 15, 2015, New Jersey Department of Parole officers recovered a loaded black .9mm gun from inside Apartment 4G at 25 Johnson. Also inside the apartment were approximately 35 bricks comprising 1,698 glassine envelopes of heroin. Of these glassine envelopes, 550 were marked with the brand "General," a brand that was purchased by the FBI during an earlier controlled buy of heroin as detailed below.

12.   The heroin and the .9mm gun were seized during the home visit of an individual who was under parole supervision at the time. Additionally, a digital scale, numerous rubber bands used to package controlled substances, and approximately $5,586.00 in U.S. currency were recovered inside the apartment.

## CONTROLLED BUYS OF HEROIN

13.   Between February 26, 2015 and November 5, 2015, the FBI conducted controlled buys inside 25 Johnson as outlined in the chart below. Some purchases were from co-conspirators who have not yet been identified and thus are not listed below. The FBI utilized more than one confidential source ("CS") for these purchases. Prior to each controlled buy, law enforcement officers outfitted the CS being utilized with an audio-video recording device,

provided that CS with United States currency with which to purchase heroin, and ensured that the CS did not have any unauthorized contraband or currency.

| Transaction Number | Date | Defendant | Amount Purchased | Brand | Other Defendants Present |
|---|---|---|---|---|---|
| 1 | 2/26/15 | First Name Unknown, Last Name Unknown, a/k/a "Malik" ("FNU LNU #1) | 1 brick (52 glassines) | 911 | MAURICE GREEN, a/k/a "Crack." |
| 2 | 2/27/15 | DAVIN LEE, a/k/a "Kiss" | 1 brick (50 glassines) | General | |
| 3 | 3/2/15 | CHRISTOPHER WILLIAMS, a/k/a "Whooty" | 1 brick (52 decks) | Morning Rush | SHAKIR AMOS, a/k/a "Ya Ya." |
| 4 | 3/4/15 | ELIJAH HENDERSON, a/k/a "Fresh" | 1 brick (51 glassines) | 30: Morning Rush 21: The Virus | |
| 5 | 3/9/15 | CHRISTOPEHER WILLIAMS, a/k/a "Whooty" | 31 glassines | Morning Rush | |
| 6 | 3/10/15 | SHAKIR AMOS, a/k/a "Ya Ya" | 30 glassines | 29: RIP 1: Unmarked (no brand) | CHRISTOPHER WILLIAMS, a/k/a "Whooty." |
| 7 | 3/11/15 | SHAKIR AMOS, a/k/a "Ya Ya" | 1 brick (50 glassines) | 48: RIP 2: Unmarked (no brand) | MELVIN ELLISON, a/k/a "Mellie." |
| 8 | 3/13/15 | OMAR JOHNSON, a/k/a "Flip" | 1 brick (50 glassines) | Obsession | |
| 9 | 3/16/15 | OMAR JOHNSON, a/k/a "Flip" | 1 brick (50 glassines) | 911 | SHAKIR AMOS, a/k/a "Ya Ya." |
| 10 | 3/30/15 | MAURICE GREEN, a/k/a "Crack" | 73 glassines | 51: Time To Kill 21: Obsession 1: Unmarked (no brand) | DARRYLE ROBINSON, a/k/a "Silk." |

| | | | | | |
|---|---|---|---|---|---|
| 11 | 4/29/15 | SHAAHID CURETON, a/k/a "Dilly" | 1 brick (50 glassines) | Blockbuster | |
| 12 | 5/7/15 | DARRYLE ROBINSON, a/k/a "Silk" | 45 glassines | 26: Ninja 18: Black Jack 1: Unmarked (no brand) | |
| 13 | 5/27/15 | OMAR JOHNSON, a/k/a "Flip" | 307 glassines | 195: Amazing 100: Brainstorm 9: Total Control 3: unmarked | CHRISTOPHER WILLIAMS, a/k/a "Whooty," MELVIN ELLISON, a/k/a "Mellie," and SHAKIR AMOS, a/k/a "Ya Ya." |
| 14 | 6/22/15 | FNU LNU #2 a/k/a "True" | 1 brick (50 glassines) | 30: Hot Sauce 10: Amazing 10: Total Control | |
| 15 | 6/26/15 | DARYLE ROBINSON, a/k/a "Silk" | 1 brick (51 glassines) | 50: Amazing 1: unmarked | ALMALIK ANDERSON, a/k/a "S," a/k/a "Sco", and DAVIN LEE, a/k/a "Kiss." |
| 16 | 6/30/15 | MELVIN ELLISON, a/k/a "Mellie" ALMALIK ANDERSON, a/k/a "S," a/k/a "Sco" | 1 brick (50 glassines) | Fire in the Hole | |
| 17 | 7/13/15 | DARREN BROWN, a/k/a D-Block | 1 brick (50 glassines) | Yo-Gotti | ALMALIK ANDERSON, a/k/a "S," a/k/a "Sco" |

| 18 | 7/14/15 | OMAR JOHNSON, a/k/a "Flip" | 1 brick (50 glassines) | Fire in the Hole | ALMALIK ANDERSON, a/k/a "S," a/k/a "Sco," CHRISTOPHER WILLIAMS, a/k/a "Whooty," SHAKIR AMOS, a/k/a "Ya Ya." |
|----|---------|----------------------------|------------------------|------------------|---------------------------------------------------------|
| 19 | 7/16/15 | FNU LNU #2, a/k/a "True" | 1 brick (49 glassines) | Rick James | MELVIN ELLISON, a/k/a "Mellie." |
| 20 | 7/20/15 | TEMIR HILL, a/k/a "Goldie" | 1 brick (50 glassines) | Hot Sauce | ALMALIK ANDERSON, a/k/a "S," a/k/a "Soc" |
| 21 | 7/21/15 | DARRYLE ROBINSON, a/k/a "Silk" | 1 brick (50 glassines) | Rick James | SHAKIR AMOS a/k/a "Ya Ya," MELVIN ELLISON, a/k/a "Mellie," and ELIJAH HENDERSON, a/k/a "Fresh." |
| 22 | 7/23/15 | DAVIN LEE, a/k/a "Kiss" | 1 brick (50 glassines) | Rick James | ALMALIK ANDERSON, a/k/a "S," a/k/a "Soc" |
| 23 | 7/23/15 | FNU LNU #3 | 29 glassines | 19: Lights Out 8: Dope Dick Em 2: Unmarked | DARREN BROWN, a/k/a "D-Block." |
| 24 | 11/2/2015 | CHRISTOPHER WILLIAMS, a/k/a "Whooty" | 1 brick (50 glassines) | Fetty Wap | |
| 25 | 11/5/2015 | SALIK AMOS, a/k/a "Slim" | 1 brick (50 glassines) | 30: Drop Dead 20: Future | |

## PLACEMENT OF HIDDEN CAMERAS INSIDE 25 JOHNSON

14.     On or about April 29, 2015, the FBI installed two hidden cameras installed inside fixtures in the first floor hallway of 25 Johnson. An undercover agent posing as a maintenance worker placed the cameras in certain lighting and exit sign fixtures in the hallway. Agents observed many of the Heroin Distributors and other defendants engage in heroin transactions in the first floor hallway during all hours of the day and night. After approximately six days, the transmission failed for no apparent reason. A subsequent video recorded controlled purchase captured on video showed the wires from the cameras sticking out of the fixtures where the cameras had apparently been ripped out.

## INTERCEPTED CALLS TO AND FROM CELL PHONES UTILIZED BY ALMALIK ANDERSON AND QUAWEE JONES

15.     On or about August 21, 2015, the Honorable Madeline Cox Arleo, United States District Court Judge for the District of New Jersey, signed an order authorizing the initial interception of wire communications over a cell phone ("Cell Phone 1").

16.     On or about October 9, 2015, the Honorable Claire C. Cecchi, United States District Judge for the District of New Jersey, signed an order authorizing the initial interception of wire and electronic communications to and from a cell phone used by Almalik Anderson, a/k/a "S" ("Cell Phone 2").

17.     On or about October 29, 2015, the Honorable Claire C. Cecchi, United States District Judge for the  District of New Jersey, signed an order, authorizing the initial interception of wire communications over a cell phone used by Jones ("Cell Phone 3").

### September 27, 2015 Calls Made To Cell Phone 1

18.     On September 27, 2015, at approximately 9:22 a.m., Anderson, utilizing **Cell Phone 2**, called **Cell Phone 1**. At the time, CS-3 was standing in the hallway of 25 Johnson with defendants Ellison and Green, among others. Anderson stated to CS-3: "Hey, let Whooty know though, bro. He's talkin' about it's his Sunday, we know it's his Sunday, but he ain't got no (unintelligible) to his self." CS-3 said, "Alright." Anderson then said, "Let him know that Zeke coming out. Somebody coming out with him . . ."

19.     Based on the investigation to date, Anderson was telling  CS-3 to convey to "Whooty," one of the Heroin Distributors (see heroin transaction numbers 3, 6, 13 and 18 above involving CHRISTOPHER WILLIAMS, a/k/a "Whooty"), that he was not to work by himself on his regular Sunday shift selling heroin inside 25 Johnson. Anderson told CS-3 he was sending another distributor named "Zeke" to work alongside "Whooty."

### September 27, 2015 Call Made To Cell Phone 2

20.     Approximately three minutes after the above-described call, CS-3 called

**Cell Phone 2**.  In this conversation, Anderson and CS-3 again discussed the assignment of Heroin Distributors to cover various shifts to work the heroin distribution inside 25 Johnson:

> CS-3: I just, I just hollered at him and shit, ya heard?

> Anderson: Yeah.

> CS-3: But it was, it was motherfuckin' (U/I)[6] shit. Like three niggas tried to come out type shit, like.

> Anderson: Who?

> CS-3: You ain't, you ain't come, I'm like, yo you uh. I'm like Sco, I'm like Sco about to come out. (U/I) for the first shift and then, you know, second shift shit. So why niggas ain't why niggas basically ain't (U/I) amongst everybody instead of like me and you having that conversation type shit.

> Anderson: Everybody was like that last night. Block and them. Block was right there, a couple niggas was right there. Niggas should have been said something about it. It was only one nigga tryin' to be slick.[7]

21.    Based on the investigation to date CS-3 was informing Anderson that he had told Defendant Christopher Williams, a/k/a, "Whooty," about Anderson assigning an additional distributor to work the shift with Williams. CS-3 explained that he had to tell the Heroin Distributors that Anderson ("Sco") was coming out for the first shift of heroin distribution to get them in line because of a problem that had occurred. Anderson then confirmed to CS-3 that there was an issue, stating that there were several members of the organization present at 25 Johnson the night before, including defendant Darren Brown, a/k/a "D-Block" ("Block") and that one of them, possibly Williams, had done something requiring Anderson to come over and speak to them about the problem ("Everybody was there last night . . . only one nigga tryin' to be slick").

### September 29, 2015 Call Made To Cell Phone 2 From Cell Phone 1

22.    On September 29, 2015, at approximately 1:31 p.m., CS-3 called **Cell Phone 2** using **Cell Phone 1**. "Zeke," the person mentioned in the call referenced in paragraphs 18-19, answered **Cell Phone 2**. CS-3 asked for Anderson ("Sco") and Anderson came on the phone. In

---

[6] U/I means that at this juncture, this portion of the recording could not be heard using readily available audio equipment.

[7] At this point in the conversation, Subject Darryle Robinson, a/k/a "Silk" took the CW1 Facility from CW1 and continued the conversation with Anderson. I have not reviewed that portion of the conversation and thus I am not aware of what was communicated in the remainder of the call as that conversation would fall outside the parameters of the court-authorized interception of the CW1 facility since CW1 was no longer a participant in the call. No conclusion or fact in this affidavit is based upon any part of the communication between Robinson and Anderson.

this conversation, CS-3 and Anderson discussed individuals who had shot defendant Green during an incident in May 2014.[8]

> CS-3: Mother fuckin' ole, you remember ole boy, you remember ole boy in the (unintelligible) who pulled up with son and them?
>
> Anderson: Yeah.
>
> CS-3: Yo, it looked like they was trying to pull on the block when I was pulling off . . . in a silver Audi, tinted.
>
> Anderson: Oh, a'ight. (Unintelligible) We good. I'm grip.
>
> CS-3: Oh, a'ight.
>
> Anderson: Where you at?
>
> CS-3: I just pulled off, I'm motherfuckin' Peshine now. I'm about to turn back around (unintelligible).
>
> Anderson: Alright, you better be careful on that bike, man.
>
> CS-3: Alright, I'm about to come right back down there. (Unintelligible) I just wanted to call you (unintelligible).
>
> Anderson: Alright.
>
> CS-3: Alright.

23.    Based on the investigation to date,  CS-3 was informing Anderson that members of a street gang who had previously shot at Green in May, 2014 were seen coming down Johnson Avenue. Anderson responded by saying he was okay because he was carrying a firearm ("We good. I'm grip.") "I'm grip" is a common street term for carrying a firearm. Anderson then told CS-3 to be careful because CS-3 was driving a motorcycle and he could be a target of the individuals driving down Johnson.

## October 11, 2015 Call From Anderson To Kasim Bacon Discussing Heroin Distributors

24.    On October 11, 2015 at approximately 5:04 p.m., Anderson, utilizing **Cell Phone 2**, called defendant  Kasim Bacon, a/k/a "City." In that conversation, Anderson and Bacon discussed several of the Heroin Distributors and that Anderson's cousin, a known drug dealer, wanted to get into the Johnson Avenue distribution ring.

> Bacon: What happen?

---

[8] During that shooting, Green was shot once and survived. A female passenger in Green's vehicle and an innocent bystander on the street were shot and killed.

Anderson: Nah.

Bacon: You talking about the shit from last night?

. . .

Anderson: This shit is funny. Rah gonna come through just now trying to talk to me.

Bacon: Who?

Anderson: My cousin, "Rah" . . . He like, "yo, what's up?' He's like, "What's up, yo. I want to bring Crack out here with you.' I'm like, I ain't trying to bring nobody out with me, Cuz. I'm good. I'm like, 'No, cuz, I wan't to come there with you, this and that, they ain't gonna say nothing. . ... You see what like niggas opened up, Bro? . . . I was just trying to feel him out. . . . So I wanted to see how far he was going to take it. . . . He said, "Man, yo, Silk my man, fuck Jones and them."

Bacon: That's crazy right there. Why would you even putting your cousin through some shit, not like that, but that ain't nothing cool right there, man. So you been had this thought on your mind then?

Anderson: Yeah. . . . I'm like they ain't gotta know we're out of the building or nothing, like so what you saying? The building shutting down in thirty days.

25.    Based on the investigation to date, Anderson and Bacon were discussing Anderson's conversation with Anderson's cousin, "Rah-Rah," a drug dealer. Anderson was explaining to Bacon how "Rah-Rah" is trying to get Anderson to cut him into the heroin distribution with Anderson's brother, defendant Maurice Green, a/k/a "Crack," and wanted to keep defendant Darryle Robinson, a/k/a "Silk" in the operation but cut out Anderson's partner, Jones, and people loyal to Jones. Bacon is commenting on how this suggestion places Anderson in a bad position ("Why would ["Rah-Rah"] even put [his] cousin through some shit . . . that ain't cool."). Anderson then stated he was not discussing with "Rah-Rah" that 25 Johnson would close in 30 days because of Newark's Code Enforcement Unit (see fn 9 and calls described below).

**October 12, 2015 Calls Made To And From Anderson and Jones Discussing Heroin Distribution at 25 Johnson**

26.    On October 12, 2015, at approximately 10:24 a.m., Jones, utilizing **Cell Phone 3**, called **Cell Phone 2**. In this conversation, Anderson and Jones discuss how another individual outside the organization distributed drugs at 25 Johnson without their permission:

Anderson: I got to the bottom of that shit with "Shay.

Quawee Jones ("QJ"): . . . Rashay?

Anderson: Yeah (Unintelligble) called me about giving him that 'oreos.'

QJ: Who?

Anderson: Your cousin and them.

QJ: Who. 'Gutta?'

Anderson: "Yeah."
. . .

Anderson: I asked Crack today like, 'yo, where he get that from?' Then he told me, such and such, crazy right?

QJ: Wow, that's why they be coming and be sitting out there and all that.
. . .

QJ: I'm like, that nigga is like, he's persistent with getting that shit in the building.

27.     Based on the investigation to date, Anderson and Jones were talking about "Rashay," an individual who was hanging out by 25 Johnson  ("they be coming and they be sitting out there), who introduced drugs ("oreos") into the building ("he's persistent with getting that shit in the building"), without Anderson's or Jones' permission.  Rashay was distributing at the building and Jones' cousin, "Gutta," had gotten narcotics from him. Anderson told Jones that "Crack," Subject Maurice Green, informed Anderson about the situation ("I asked Crack . . . where [Gutta] got that from. …").

28.     Further on in that same call, Anderson and Jones discussed how defendant Davin Lee, a/k/a "Kiss" (see heroin transactions numbered 2 and 22 above), tried to distribute heroin in another location without telling Anderson or Jones:

Anderson: "Man, let me tell you what the customer said. Oh yeah, Kiss and them gave me their number, they opening up another building. I said, what? (Unintelligible) opening up another building, what? He gave them his number."

QJ: "They tried to go around the corner and use 'Cretta?' 'Cretta' shut that shit down. . . . I'm like them niggas trying to find somewhere in close."

Anderson: "Violate them. Them niggas crazy. You don't do no shit like that man."

QJ: "Yeah, that shit over with."

16

Anderson: "They thought we wasn't going to get to the bottom of it!"

29.    Based on the investigation to date Anderson was informing Jones that a heroin buyer told Anderson that Davin Lee, a/k/a "Kiss," was handing out his telephone number in order to make future sales of heroin with the buyer at a building around the corner. Jones responded that the heroin distributors at 25 Johnson were to find another building nearby to steal away buyers.[9]  This is corroborated by a controlled purchase of 40 glassines of heroin from Lee on November 5, 2015 where CS-2 met Lee one block east of 25 Johnson on Milford Avenue to complete the transaction.

30.    On October 12, 2015, at approximately 12:18 p.m., Anderson, utilizing **Cell Phone 2**, called **Cell Phone 3**, utilized by Jones. In this conversation, Anderson and Jones discussed how one of the defendants, Darryle Robinson, a/k/a "Silk" (see heroin transactions numbered 12, 15 and 21) was bringing in a heroin distributor to work a shift at 25 Johnson Avenue without Anderson's or Jones' permission:

QJ: "Hey, yo, some niggas still just don't put Papi[10] in the building though."

Anderson: "I thought you talked about that, bro."

QJ: "No, I told them niggas, like no, like I ain't feeling how that nigga move and how he come and how he put that out there and all like that. . . . they just keep trying to put him in the building though."

Anderson: "I thought you niggas talked about that. Alright, I understand. (U/I) come and talk. And we gonna bring his little ass too."

. . .

QJ: "Yeah, I told them niggas that, like. He feel like he can just do that and then he still be out there? Like, I ain't feeling that. … Like for him to feel like he can just be going against me, grabbing shit with them and all that."

Anderson: "It was never a talk about the situation? There was an okay?"

---

[9] During September, 2015, Newark Code Enforcement gave notice to the residents of 25 Johnson Avenue that Newark was seeking to permanently close 25 Johnson Avenue due to code violations. This conversation was likely precipitated also by the fact that the City of Newark enforcement action might result in 25 Johnson Avenue closing down. Thus, the heroin distributors were looking for another location to continue selling heroin without permission from Anderson and Jones.

[10] "Papi" has been identified as an individual who, during at least one recording made by the FBI in August 2015, was seen in the hallway of 25 Johnson participating in heroin transactions.

QJ: "Yeah, I told them niggas. I expressed all that to them niggas. They still just don't do it. They tell me like "yeah, you right.' Then Silk keep trying to talk to me on some shit like, "Man, I need somebody else though, bro.' So that's when I started letting him use Bazz, his cousin. I'm like, "Well, take him.' He still keep tryin'

. . ."

Anderson: "I gave them my little cousin, too."

QJ: "Exactly, but he still keep trying to outmaneuver him in, like (unintelligible)."

. . .

Anderson: "This is what we're gonna do, right. As soon as (unintelligible) pulls up, and Silk, I'm a call you, we gonna meet up somewhere, and we gonna bring him too. And we gonna get to the bottom of this. While I'm right there, like feel me?"

31.    Based on the investigation to date I believe Jones was informing Anderson that Subject Darryle Robinson, a/k/a "Silk," was recruiting "Papi" to help him sell heroin inside 25 Johnson Avenue without Anderson's or Jones' permission. Anderson asked Jones if he had discussed the situation with Silk and Jones told Anderson that Silk claimed he needed another person for the shift (to distribute the heroin) even after Jones offered another person (Silk's cousin, Bazz) and Anderson said he offered to have his cousin also work with Silk. Anderson decided to confront Silk in person with Jones present ("We gonna get to the bottom of this. While I'm right there . . .").

**October 31, 2015 Call Made In Which Jones Discusses 15 Bricks of Heroin Branded "Fetty Wap," "Michelle," or "COD"**

32.    On October 31, 2015, at approximately 1:58 p.m., Jones, utilizing **Cell Phone 3**, received a call from an unknown male ("UM-1"). In this conversation, UM-1 asked Jones to get him 15 bricks of heroin. Jones stated he was going to call his supplier and see if the bricks were available. At approximately 2:41 p.m., UM-1 called Jones back to check if Jones could get him the 15 bricks of heroin.

UM1:  What happened cuz'?

QJ: He said that shit not around right now.

UM1: Aw, man.

QJ: He said next time it come around, he gonna call me.

UM1: Aw.

QJ: So I could be the first to grab.

UM1: Oh shit, alright.

QJ: You ain't got nothing?

UM1: I a'int got shit cuz, for two days, man.

QJ: I got some shit called Fetty Wap. You wanna try it?

UM1: That shit, it, cause they got some "Michelle" and "COD" out here man.

QJ: That shit rockin'. You want "Michelle" or "COD"?

UM1: I'm sayin' they got "Michelle" or "COD" out here but niggas ain't getting for me man.

### November 2, 2015 Controlled Purchase of One Brick of Heroin Branded "Fetty Wap" at 25 Johnson

33.     Two days later, CS-1, in a recorded transaction, purchased one brick of heroin branded "Fetty Wap" from one of Jones' distributors, defendant Christopher Williams, a/k/a "Whooty," inside 25 Johnson Avenue (see heroin transaction number 24, September 27, 2015 call described above and November 3, 2015 call described below).

### November 1, 2015 Call From Jones To Kasim Bacon, a//k/a "City" Discussing Discipline of Heroin Distributors Inside 25 Johnson

34.     On November 1, 2015, at approximately 2:52 p.m., Jones called defendant Bacon[11] to discuss Bacon disciplining two of the Heroin Distributors who were selling too far outside the front door of the building and which could draw the attention of police.

QJ: What up man? Niggas can't control they little niggas or something?

Bacon: Man, them niggas is crazy, bro you had to see that shit just now. Man I had to take them two outside to talk to them separately. Like, umm, the two brothers and then the other one is still big headed.

QJ: They saying niggas hustling by the mailbox, niggas trying to go to jail?

. . .

---

[11] Bacon's voice was identified by an East Orange police officer who has known Bacon for many years. The telephone used by Bacon is registered to Kasim Bacon.

Bacon: For now its settled, I guess. You know man I sent the little nigga home. Told him to go home. Like, I'll talk to you face-to-face, might give you a better understanding.

. . .

QJ: I was on my way like, niggas can't control nobody like, I'm about to start punching niggas in they face. Making them grab they pistols so I can do something to them. To get niggas out of the way. I'm tired of dealing with these little ass punk niggas that ain't about the action. That shit make me mad. Like frustrated, you can't even run your own situation, right? . . . Whoever the fuck it is need to be checked. That shit crazy, bro. Like niggas ain't trying to go to jail. "S" was, is forcing niggas to do all this dumb shit. Like go to jail, like. My shit is off the porch. Niggas shouldn't even be on the porch, like, for what?

35.    Based on the investigation to date, Bacon was one of the top managers under Anderson and Jones and according to CS-2, Bacon often comes to 25 Johnson before Jones delivers the heroin to the distributors to make sure the building was clear of any police or anyone who might rob the shipment of heroin. Bacon in this call was telling Jones that he disciplined two of the Heroin Distributors (and sent one home from a shift selling heroin) because the two distributors were selling "by the mailbox" which is located on the street in front of the building in violation of Jones' desire to sell only from within the hallway behind the front doors. Jones said the actions of the distributors in selling outside on the street would result in police arresting them. Jones also blamed Anderson for being too lax on this policy ("S is forcing niggas to do all this dumb shit. Like go to jail.").

**November 3, 2015 Calls to Unknown Female From Jones Regarding the Operation of the Heroin Organization**

36.    On November 3, 2015, at approximately 7:52 p.m., **Cell Phone 3** utilized by Jones called another telephone facility. In that call, FBI agents heard Jones speaking to an unknown female[12] ("UF"). In that call, Jones and the UF discuss how one of the Heroin Distributors owes Jones for bricks of heroin:

QJ: What's up with this nigga Whooty ducking me all day?

UF: Man, I don't know bro. . . . Something was fishy cause he was moving funny as hell, like. And he wouldn't answer the phone for Duke.
. . .

QJ: Yeah.

. . .

UF: For 25?

_____
[12] The unknown female might be the sister of a former member of Anderson's drug organization.

QJ: Yeah.

UF: Oh my fucking God. And he owe Mal too. Mal, I just was in the hood. Mal told me he was looking for him too.

QJ: What he owe Mal for?

UF: I think Mal said ten.

. . .

QJ: He still, he still owes for 25. But he said he got money for eight and 15.

UF: Yeah, why didn't he give you, give you all the money?

37.     Based on the investigation to date, I believe Jones was discussing with the UF that a member of the organization, "Whooty," owed Jones for 15 bricks of heroin and owed another member, "Mal," for ten bricks of heroin. When Whooty got paid for 23 bricks, the UF questioned why Whooty did not take that money and repay Jones for the 15 bricks that Jones provided on consignment.

38.     On November 3, 2015, at approximately 10:36 a.m., **Cell Phone 3** utilized by Jones called a telephone facility utilized by the same UF. In that call, Jones and the UF discussed a location where the drug organization was storing heroin:

QJ: Yo sis, what you doin'?

UF: Right here in the lab.

QJ: Yo, do me a favor. Grab them pieces, grab them pieces that Whooty got and . . . bring them to the hood. Because (unintelligible) don't got nothing. . . . They just standing right there waitin' for something. . . . So grab them shits."

UF: Alright.

39.     Based on the investigation to date,  Jones was discussing with the unknown female that the Heroin Distributors at 25 Johnson Avenue had run out of bricks of heroin to sell ("They just standing right there waitin' for something") and Jones was ordering the UF to prepare more bricks ("pieces") to be brought to the building.

**November 3, 2015 Call to Unknown Male From Jones Regarding the Payment of Tenants and Lookouts at 25 Johnson Avenue**

40.     On November 5, 2015, at approximately 7:14 p.m., **Cell Phone 3** utilized by Jones called another telephone facility. In that call, FBI agents heard Jones discuss with an unknown male ("UM-2") that UM-2 had to pay for lookouts and people inside 25 Johnson to keep their

door open in order to prevent arrest by police.

QJ: What's up with you not paying the door lady?

. . .

UM-2: You know you talking about 50, 25 dollars for the door to go in then you're talking about 10 dollars for a lookout, that's 35 dollars right there cuz.

QJ: Bro, that's one Breezy that you taking a fucking. That's one you can, that's one brick for free. Basically for your protection . . . No, that's everyday just for that shit being open and she gonna lock her door you going . They blitz you ain't going to have nowhere to go, everybody going to get low, you going to be in that hallway.

41.    Based on the investigation to date, Jones was discussing with UM-2, a  Heroin Distributor, that he has to pay $25 per day to a female tenant of 25 Johnson Avenue to keep her apartment door open in case the police come in ("blitz"). If he does not pay, he will be caught in the hallway. UM-1 is told Jones that he also had to pay $10 for the lookout. Jones said $35 is only the profit for one brick of heroin ("Breezy"), so it is like giving away one free brick per day in order to hire protection, that is, the lookout and the tenant to provide an escape route from any police raid.

**November 3, 2015 Call to Unknown Male From Jones Regarding How Much Profit Heroin Distributors Earn Per Brick at 25 Johnson Avenue**

42.    In the same call referenced in paragraph 36, Jones and UM-2 discuss the profit UM-2 is making per brick.

UM-2: That crazy man, look I'm losing out.

QJ: Man, how you losing if you only paying with one joint?

UM-2: I'm losing out period cuz coming on the block cuz you know how it goes cause I was up to fifteen breezies making way more than that cuz. Now I'm making two trips.

QJ: You said what?

UM-2: You know how many pieces I be getting cuz. I say I'm up to that so my profit be coming out way more than that cuz and now look you say 210 of it each one, right?

QJ: Uh huh.

UM-2: 210 that's a (unintelligible) profit. Boom.

QJ: How many joints you rocking today bro?

UM-2: I said I told you how many things I was rocking cuz you be like.

QJ: You ain't thinking about how sweet it is. Nigga you ain't, you ain't got to use your money at all.

UM-2: Nah, you right, you right cuz. You right. You right.

QJ: You getting hit with the joint. You making 300 profit off every ten.

UM-2: Alright, alright cuz, I got you. I got you.

QJ: You making more than me. I ain't complaining, like how you complaining? . . . You making over $300 a day so that's profit. . . . So you telling me $35 for your safety is hurting you?

43.    Based on the investigation to date, Jones was explaining to UM-2 that UM-2 sells enough bricks in a day (referred to as "joints" and "breezies") to make $300. The profit is the difference between the price Anderson and Jones sold the bricks of heroin to the Heroin Distributors, including UM-2, which is approximately $160 to $180, and the approximately $210 to $240 the Heroin Distributors sell to the buyers who come to the building. UM-2 thus makes about $30 per brick ("You making 300 profit off of every ten."). Finally, Jones said that $35 is a small price to pay for the lookout and for the tenant to keep an apartment door open for an escape route.

**November 4, 2015 Call Between Jones and Anderson Regarding Jones' Cousin Selling Heroin Inside 25 Johnson and Disrespect Shown To Anderson**

44.    On November 4, 2015, at approximately 10:14 a.m., Anderson, utilizing a new cell phone[13] called Jones and discussed a person who appears to be Jones' cousin and a member of the Crips street gang who disrespected Anderson inside 25 Johnson Avenue.

Anderson: Yo, like bro, that right there ain't no good with him bro, ya heard?

QJ: What he do?

Anderson: Bro, he from over there, bro. Bergen, he be with all them niggas bro, like you know the situation with me and them Crip niggas, you know I . . . you feel me?

---

[13] **Cell Phone 2**, previously utilized by Anderson, was shut off by the phone carrier on or about October 16, 2015. Anderson contacted Jones during the interception period of **Cell Phone 3** from a new cell phone with an Atlanta area code (404). Anderson's voice has been positively identified by law enforcement.

QJ: That ain't shit, he is my little family bro, he ain't nothing like that, he ain't even, he just trying to get money. . . . you think he going to go over me, and shit like, come on bro, that's my little cousin like, he ain't saying nothing to nobody.

Anderson: Listen, hold on, listen, listen. I came in the hallway, I said, "Yo, what are you doing?" I said, "Slow down brother, look." I said, "Call Jones." He start being reckless . . . blah, blah, blah, bro, like nobody being like that.

QJ: At the end of the day, he a man like, he ain't going to just let nobody talk to him.

Anderson: I wasn't even talking to him though, I'm talking to Slim. That ain't his place bro, to say anything in the hallway like.

45.     Based on the investigation to date, Anderson was complaining that Jones' cousin Was selling heroin inside 25 Johnson Avenue when he said something to disrespect Anderson in front of some of the Heroin Distributors, including defendant Salik Amos, a/k/a "Slim." Jones' cousin is a member of the Crips from Bergen Street in Newark, a location controlled by the Crips street gang.  Anderson reminded Jones that Anderson has a longstanding feud with the Crips.